**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL BENWAY, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:11-CV-02233 |
| | : | |
| vs. | : | (Complaint Filed 12/1/11) |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael Benway's claim for social security disability insurance benefits and supplemental security income benefits.

On May 13, 2008, Benway filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 11, 55-56, 116-118, 124-125, 127 and 132.[2] The applications were initially denied by the Bureau of Disability Determination[3] on March 13, 2009. Tr. 59-68. On May 1, 2009, Benway

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2] References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on January 31, 2012.

[3] The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration. Tr. 60 and 65.

requested a hearing before an administrative law judge. Tr. 71-72. After over 10 months had passed, a hearing was held on March 25, 2010. Tr. 25-54. On July 8, 2010, the administrative law judge issued a decision denying Benway's applications. Tr. 11-20. On August 2, 2010, Benway filed a request for review with the Appeals Council. Tr. 7. After the passage of over 14 months, the Appeals Council on October 11, 2011, concluded that there was no basis upon which to grant Benway's request for review. Tr. 1-6. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Benway then filed a complaint in this court on December 1, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on April 23, 2012, when Benway elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Benway met the insured status requirements of the Social Security Act through December 31, 2012. Tr. 11, 13, 127 and 132.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Benway who was born in the United States on June 16, 1963,[5] withdrew from school after commencing the 7th grade. Tr. 29, 55, 116-117, 127, 132 and 141. Benway can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 135 and 146. In 1998 and 1999, Benway obtained a CFC (Chloroflurocarbon) and R410A product training certification for work in the heating, ventilation and air conditioning (HVAC) field. Tr. 142.

Benway has past relevant employment[6] as a HVAC technician which was described by a vocational expert as skilled, medium work, and as a floor technician described as unskilled, medium work.[7] Tr. 49-50. Benway reported that he worked in the

---

[5]At the time of the administrative hearing and the administrative law judge's decision, Benway was 46 and 47, respectively, and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[6]Past relevant employment in the present case means work performed by Benway during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[7]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(continued...)

HVAC field from 1983 to 2005. Tr. 153. The floor technician position involved carpet cleaning and the stripping, waxing and buffing of floors at a nursing home from 2006 to 2008. Tr. 153-154. Benway also worked as a cook from 1995 to 1997 and as a laundry delivery person from 1992 to 1993. Tr. 153 and 155-156.

---

[7](...continued)
> (b) *Light work*. Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that
> he or she can also do sedentary work, unless there
> are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*. Medium work involves lifting no
> more than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds. If
> someone can do medium work, we determine that
> he or she can do sedentary and light work.
>
> (d) *Heavy work*. Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he
> or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

Records of the Social Security Administration reveal that Benway had earnings in the years 1979 through 1990, 1992 through 1994 and 1996 through 2007. Tr. 128. Benway's annual earnings ranged from a low of $42.50 in 1994 to a high of $43,913.86 in 2003. Id. Benway's total reported earnings were $379,691.70. Id. From 1999 through 2005, Benway's annual earnings were greater than $32,000.00. Id. In 2006 and 2007,Benway earned $13,490.29 and $7294.89, respectively. Id.

Benway alleges that he became disabled on August 14, 2007, because of both physical and psychiatric problems. Tr. 136. The physical problems alleged are chronic obstructive pulmonary disease, sleep apnea, coronary artery disease and a disorder of the lumbar spine. Doc. 9, Plaintiff's Brief, p. 1. As for the psychiatric impairments, Benway claims he suffers from anxiety and depression. Id. In a document filed with the Social Security Administration, Benway stated that he has difficulty "lifting, carrying, walking up stairs, walking up hills, walking too long" and that "heat and even sex will throw [him] into breathing and anxiety attacks" and "will cause tightness and pain in the chest." Tr. 136. Benway reported that he has not worked since August 13, 2007. Id. The record reveals that Benway has smoked cigarettes, 2 packs per day, for over 30 years. Tr. 643, 762, 776, 823 and 848.

Benway on July 11, 2008, completed an 8-page document entitled "Function Report – Adult" in which he stated that he had no problem with personal care, other than "putting socks and shoes on." Tr. 144. Benway indicated he prepares simple meals and performs some household repairs and needs no encouragement to engage in these activities. Tr. 145. Benway stated that his hobbies were playing football, camping and swimming but that he used to do these all the time but now he can only "handle camping

here and there." Tr. 147.  Benway needs no reminders to go places.  Id.   Benway admitted that he could lift 5 to 10 pounds "as long as I don't climb stairs or walk with the weight." Tr. 148.  He stated that he has breathing problems when he squats, bends, reaches, walks, kneels and stair climbs.  Id.   He reported that he could walk one to two blocks and than would have to rest 2 to 3 minutes.  Id.  He reported no problems with following written and oral instructions and getting along with authority figures. Tr. 148-149.  In the "Function Report," Benway when asked to check items which his "illnesses, injuries, or conditions affect" did not check talking, hearing, seeing, understanding, following instructions, using his hands and getting along with others. Tr. 148.  The "Function Report – Adult" was completed by Benway in legible handwriting.  Tr. 143-150.

For the reasons set forth below we will affirm the decision of the Commissioner denying Benway's applications for disability insurance benefits and supplemental security income benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's

findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which

evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.   Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**<u>SEQUENTIAL EVALUATION PROCESS</u>**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  <u>See</u> 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner to consider,

in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.

_____

[8]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[9] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

[10]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[11]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail the medical records. The relevant time period for review of the medical records is from August 14, 2007, the alleged disability onset date, to July 8, 2010, the date the administrative law judge issued his decision and our task is to focus on the records before the administrative law judge when assessing whether or not his decision is supported by substantial evidence.[12]

The first such records we encounter are from September 5, 2007. Tr. 762-770. On that date Benway visited the emergency department at Memorial Hospital, York, Pennsylvania, complaining of left elbow pain which had been ongoing for 4 days. Tr. 762,

---

[12]After the administrative law judge issued his decision, Benway's attorney submitted further evidence to the Appeals Council. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. Benway has not argued that the evidence submitted to the Appeals Council provides a basis for a sentence 6 remand.

766 and 768.   Benway arrived at the emergency department under his own power, i.e., ambulatory. Tr. 762.  The social history taken by the nursing staff indicates that Benway at the time was smoking 2 packs of cigarettes per day.  Id.   It was noted that Benway had a history of left elbow pain and had been diagnosed with lateral epicondylitis (tennis elbow) and had received 4 cortisone injections in the past.  Tr. 762 and 766.   The vital signs taken by the nursing staff were essentially normal: temperature 95.9, pulse 74, respirations 16, blood pressure 116/74 and blood oxygen level 97% on room air. Tr. 762.  Benway was examined by two physicians, Marlys J. Pike, M.D., and Andrew Kerman, D.O. Tr. 766 and 768.   The results of the  physical examinations performed by these two physicians were essentially normal other than for pain and tenderness in the left elbow.  Tr. 766-770.   Dr. Kerman conducted a clinical interview and reported the following:

> The patient is a laborer and does a lot of heavy lifting and use of his arms including floor waxing and these types of activities at work and states that this may have been what has brought on his pain.  Pain ranges anywhere from a 2-10/10, described as sharp at times, dull and achy most of the time with sharp exacerbations. Pain is obviously worsened with movement.  At this time he denies headaches.  No nausea, vomiting.  No fevers, chills or diaphoresis.[13]  No chest pain, shortness of breath.  No abdominal pain.  No change in bowel or bladder function or sensation.  No loss of strength or sensation in the distal extremities.

Tr.768.  Both physicians concluded that Benway suffered from tennis elbow.  Benway was given a nonsterodal anti-inflammatory pain medication (Toradol) and discharged from the hospital with instructions to follow-up with an orthopedic physician. Tr. 769.

On September 12, 2007, Benway again visited the emergency department at

---

[13]Diaphoresis is defined as sweating.  See Dorland's Illustrated Medical Dictionary, 509 (32nd Ed. 2012).

Memorial Hospital but with a new complaint. Tr. 674-683. During this visit Benway complained of chest pain. Id. Benway was admitted to the hospital. Tr. 681. An EKG revealed a normal sinus rhythm (beating of the heart); cardiac blood tests (CK-MB and troponin)[14] were normal; and a chest x-ray was unremarkable "except for some peribronchial thickening consistent with bronchitis." Tr. 682. The results of a physical examinations performed on September 12th were essentially normal except for decreased breath sounds in both lungs and expiratory wheezes. Tr. 675 and 678-679. Benway was neurologically intake and had normal motor strength. Tr. 675 and 678. He had no paraspinal muscle tenderness with palpation of the thoracic, lumbar or cervical spine and his range of motion of the upper and lower extremities was within normal limits. Tr. 679. Benway underwent exercise stress echocardiography on September 13, 2007, which was negative "for both the echo portion and the stress portion."[15] Tr. 682. The ultimate impression was that Benway suffered from chest pain secondary to acute bronchitis. Id. Benway was discharged from the hospital on September 13, 2007. Tr. 681. During this hospital stay, Benway was observed "outside numerous occasions" smoking and he was advised by an attending physician that he needed to "take control of his pulmonary condition by not smoking." Tr. 683. Also, during this hospital stay, it was noted in the medical records that Benway had

---

[14]These are blood tests which if positive suggest cardiac muscle damage or that the patient suffered a heart attack.

[15]Benway "was able to ambulate for 8 minutes of a Bruce protocol stress test and achieved a maximum heart rate of 144 beats per minute or 82% of maximum predicted for age" and exercised to 10 METs. METS is an abbreviation for metabolic equivalents of tasks, that is the multiples of resting oxygen uptake. The ability to exercise to 10 METS is consistent with "a good exercise tolerance." Mark D. Darrow, M.D., Ordering and Understanding the Exercise Stress Test, American Academy of Family Physicians, http://www.aafp.org/afp/1999/0115/p401.html (Last accessed July 29, 2013).

normal range of motion, normal extremity strength,  a steady gait and ambulated without help. Tr. 718 and 727

On October 4, 6, 13, and 14, 2007, Benway was treated at the emergency department of Memorial Hospital for an abscess on the right buttock/tailbone. Tr. 607, 616-618, 623, 632-636 and 642-650. On these occasions Benway was ambulatory and had no cardiac, respiratory or musculoskeletal complaints. Id.  In fact on October 4th it was noted with respect to Benway's musculoskeletal system that he had "full movement" and intact sensation. Tr. 648.  Benway was smoking 2 packs of cigarettes per day and occasionally drinking alcoholic beverages. Tr. 643.

On January 30, 2008, Benway was examined by his family physician, K. Barry Wentland, D.O., in York, Pennsylvania. Tr. 328.   At that appointment  Benway complained of breathing problems for one week and increased tightness in the chest and shortness of breath while walking up steps. Id.   Benway also complained of suffering from anxiety and headaches for 5 days straight but noted that his father passed away the previous week. Id. Benway reported that he was down to 15 cigarettes per day or  3/4 of a pack.   Other than a scalp cyst on the back of the head and some left sided facial drooping which looked like Bell's Palsy, the results of a physical examination were essentially normal. Id.   Benway was encouraged to stop smoking, prescribed the drug Zoloft and the drug Ativan as needed for anxiety. Id. He was also given a fact sheet on Bell's Palsy and advised if the condition worsened to call the clinic.  Id.

At an appointment with his family physician on March 26, 2008, Benway reported that he stopped taking Zoloft because it was making him sick and that he was only taking the Ativan. Tr. 329.  He reported that he was having abdominal pain, rectal bleeding

and difficulty concentrating and that he was down to 10 cigarettes per day or ½ pack. Id. The family physician discontinued the prescription for Zoloft and prescribed Celexa and referred Benway for a colonoscopy and to the surgical clinic because of a recurrent gluteal[16] abscess. Id.

On March 31, 2008, Benway was examined in the surgical clinic for a pilonidal[17] cyst in the gluteal area. It was decided not to perform surgery until Benway underwent a colonoscopy. Tr. 249. The colonoscopy was performed on April 2, 2008, which revealed a "[n]ormal colon with internal hemorrhoids." Tr. 598. On April 14, 2008, Benway had an appointment with his family physician, Dr. Wentland, regarding a reaction he had to the drug Remeron, i.e., nausea and vomiting. Tr. 330. Dr. Wentland discontinued that drug and continued Benway on Ativan for "ongoing panic attacks." Id. On May 29, 2008, the pilonidal cyst was removed and on June 2 and 11, 2008, it was reported that the" wound [was] healing well" and the "wound is healing nicely," respectively. Tr. 239 and 241. The examining physician, Kyle A. Herron, M.D., on June 11, 2008, gave Benway a prescription for oxycodone because he was complaining of some pain in the area of the incision. Id. On June 18, 2008, at the surgical clinic Benway had skin tags removed from the right and left armpits. Tr. 236-237. On June 25, 2008, Benway had a follow-up appointment at the surgical clinic for treatment of the pilonidal cyst incision site. Tr. 233.

On July 10, 2008, Benway visited the emergency department at Memorial

---

[16]Gluteal is defined as "pertaining to the buttocks." Dorland's Illustrated Medical Dictionary, 792 (32nd Ed. 2012).

[17]Pilonidal is defined as "pertaining to, characterized by, or having a nidus or tuft of hairs." Dorland's Illustrated Medical Dictionary, 1448 (32nd Ed. 2012).

Hospital complaining of pain in his "right great toe region . . . of approximately 1 day duration" but denied trauma, fevers or chills. Tr. 567.   Benway reported that he took oxycodone tablets "without much relief" and denied any history of similar symptoms in the past. Id.   He further stated that otherwise he had been in "well-health." Id.   The results of a physical examination were essentially normal, including Benway had normal muscle strength in his upper and lower extremities and was able to move all extremities with no focal deficits. Tr. 568.   An x-ray of the right foot revealed no fractures. Id.   Benway did have "some mild erythema [redness of the skin] about the right great toe metatarsal phalangeal joint." Id. The assessment was that Benway "likely" suffered from podagra (gout) but it was noted that he had no previous history of that condition. Tr. 568-570.  Our review of the record did not reveal that a uric acid blood test was ordered.  If such a test was performed and revealed an abnormal level of uric acid in the blood such a finding would have been supportive of a gout diagnosis. See National Institute of Arthritis and Musculoskeletal and Skin Diseases, What is Gout? Fast Facts: An Easy-to-Read Series of Publications for the Public, http://www.niams.nih.gov/Health_Info/Gout/gout_ff.asp (Last accessed July 29, 2013).

On July 16, 2008, Benway again received follow-up treatment at the surgical clinic for the pilonidal cyst excision site which was reported to be "healing well." and that he no longer needed dressing changes to the area.  Tr. 230.  On July 23, 2008, he again received treatment at the surgical clinic for abscesses positive for methicillin-resistant Staphylococcus aureus (MRSA) on his buttock and under the left armpit. Tr. 226.

Benway on or about July 29, 2008, punched a mirror with his right hand and then visited the emergency department at Memorial Hospital complaining of right hand pain.

15

Tr. 557.   X-rays performed were negative for fracture, dislocation or ulnar variance, but positive for soft tissue swelling. Tr. 557-558.  The assessment was right hand contusion and abrasions. Id.  Benway had an antiseptic skin cleanser (Hibiclens) applied to the hand and then Bacitracin and gauze were applied to the abrasions. Tr. 558.  Benway was offered pain medications but he declined the offer and he was discharged in a stable condition. Tr. 558-559.   During this visit Benway made no complaints about his cardiac, respiratory or musculoskeletal system (other than the injury to his hand). Tr. 564.  The nursing record reveals that he reported he was smoking 1 ½ packs of cigarettes per day and drinking minimal amounts of alcohol. Tr. 551.

On August 11, 2008, Benway visited the emergency department at Memorial Hospital complaining of chest pain. Tr. 535-536 and 540-543.  Benway's vital signs were normal: blood pressure was 121/70, pulse 72, respiration 20 and blood oxygen level 98% on room air.Tr. 535.  A cardiac monitor revealed that he had normal sinus rhythm. Id. Benway reported he was smoking 1 ½ packs of cigarettes per day and drinking minimal amounts of alcoholic beverages. Id.  The results of a physical examination were essentially normal, including he had full range of motion of the back. Tr. 536 and 541.  Benway had no wheezing of the lungs but "mild rales [crackles] left and right base." Tr. 536.  Benway was prescribed Ativan and discharged from the hospital. Id.  On August 14, 2008, Benway had a follow-up appointment with his family physician regarding the chest pain. Tr. 331. The results of a physical examination were essentially normal other than Benway's blood pressure was elevated, he had positive wheezes on inspiration and expiration of the lungs, and he was observed to be obese. Id.   It was also noted in the record of this follow-up appointment that Benway had filed for disability and apparently presented to his family

16

physician forms to be filled out. Id.

On August 20, 2008, Benway visited the emergency department at Memorial Hospital 36 minutes after he punched a wall with his right hand. Tr. 523-527. Benway suffered a closed fracture to the right fifth metacarpal. Tr. 524. Other than the fracture, the results of a physical examination were essentially normal, including having full muscle strength in the extremities and a steady ambulatory gait. Id. A splint was applied to the right hand and Benway was discharged from the hospital. Id. He was advised to follow-up with an orthopedic physician in 2-3 days and prescribed the drug percocet every 4-6 hours for mild to severe pain. Id. The nursing notes of this visit by Benway to the emergency department reveal that he reported that he was smoking 2 packs of cigarettes per day and drinking minimal amounts of alcoholic beverages. Tr. 518. Furthermore, other than the injury to the hand, Benway did not report any other physical problems, including musculoskeletal, cardiac, respiratory and neurologic. Tr. 530.

On September 3, 2008, Benway was examined by Barry B. Hart, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 250-257. Dr. Hart after conducting a clinical interview and a mental status examination concluded that Benway suffered from panic disorder without agoraphobia and an adjustment disorder with mixed anxiety and depression and gave him a Global Assessment of Functioning (GAF) score[18]

---

[18]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or

(continued...)

of 57, representing a moderate impairment.[19]  Tr. 253.   Dr. Hart noted that Benway's

concentration was reasonably intact and that "his intelligence was estimated to be at a low-

average level." Id.  In assessing Benway's mental impairments at a moderate level, Dr. Hart

noted that Benway's prognosis was "quite guarded" because "he is not receiving any

counseling or psychotherapy" and "[t]he only help his is getting is from his family doctor and

he has very little motivation to seek out additional treatment." Tr. 254.

On September 18, 2008, Benway had an appointment with Dr. Wentland.  Tr.

332.  The record of this appointment (the portion that is legible) only contains a notation that

Benway had decreased sensation of left thigh, L2 dermatome[20] but normal deep tendon

reflexes[21] and Dr. Wentland's assessment was that Benway suffered from  anxiety, chest

---

[18](...continued)
judgment or inability to function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in several areas,
such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of
41-50 indicates serious symptoms or any serious impairment in social, occupational or
school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any
moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to
70 represents some mild symptoms or some difficulty in social, occupational, or school
functioning, but generally functioning pretty well with some meaningful interpersonal
relationships. Id.

[19]Dr. Hart did find that Benway had moderate to marked limitations in his ability to
respond appropriately to work pressures in a usual work setting. Tr. 254.

[20]A dermatome is an area of the skin mainly supplied by a single spinal nerve, There
are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular
nerve root should correspond with a sensory defect, muscle weakness, etc., at the
appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape
Reference, http://emedicine.medscape.com/article/1878388-overview (Last
 accessed July 31, 2013).

[21]Complete absence of the patellar reflex can be a sign of neurological damage or
compression in the L2, L3 or L4 region of the lumbar spine. Nerve Function Tests for
(continued...)

18

pain, fracture of the right metacarpal, leg pain with numbness and chronic obstructive pulmonary disease. Id.   Dr. Wentland prescribed the drugs Flexeril and Naprosyn for 14 days. Id.

On September 25, 2008, Benway was examined by C. Edwin Martin, M.D., a cardiologist, because of Benway's complaints of heart palpitations. Tr. 260-261.  Dr. Martin noted that Benway continued to smoke. Id.   A stress test was performed and Benway exercised 7 minutes of a Bruce protocol which Dr. Martin noted was below average for his age. Id.  Dr. Martin noted that in September, 2007, Benway's ejection fraction was 50% but that it presently was 56%.[22] Id.   Benway's blood pressure was 130/80.  An examination of Benway's lungs revealed expiratory wheezes. Id.   A cardiac examination revealed no murmurs, rubs or gallops. Id.  Dr. Martin recommended a 24-hour Holter monitor test and scheduled Benway for heart catheterization and coronary arteriography. Id.   The results of the Holter monitor reveal a normal sinus rhythm but moderately frequent premature ventricular contractions (PVCs).[23]  Tr. 258-259.  Benway's EKG was normal otherwise. Id.

---

[21](...continued)
Evaluating Low Back Problems, emedincinhealth, http://www.emedicinehealth.com/nerve_function_tests_for_evaluating_low_back_problems-health/article_em.htm (Last accessed July 31, 2013).  Benway had normal deep tendon reflexes.

[22]The ejection fraction is the percentage of blood pumped out of the left ventricle of the heart in a single beat. A normal left ventricle ejection fraction is 55% or higher. See Martha Grogan, M.D., Ejection fraction: What does it measure?, Mayo Clinic, http://www.mayoclinic.com/health/ejection-fraction/AN00360 (Last accessed July 30, 2013). "Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range." Id.

[23]"Premature ventricular contractions (PVCs) are extra, abnormal heartbeats that begin in one of your heart's two lower pumping chambers (ventricles).  The extra beats disrupt your regular rhythm, sometimes causing you to feel a flip-flop or skipped beat in
(continued...)

19

On October 3, 2008, Benway had an appointment with Dr. Wentland at which he complained of leg and back pain and stated that he was suffering from that condition for 2.5 years. Tr. 332. Benway reported that the Flexeril and Naprosyn prescribed on September 18th had no impact on his pain. Id. The record of this appointment does not contain physical examination findings. Id.

On October 10, 2008, Benway underwent cardiac catheterization which revealed that "his coronaries were clear" and "[h]is pulmonary pressures were not elevated despite his prolonged smoking history and his [left ventricular] function appeared to be at the lower limits of normal, ejection fraction was estimated at 50%, +/- 5%. Filling pressures were normal. Mixed venous saturation was preserved at 71%, consistent with normal cardiac output." Tr. 513. In reporting on the catheterization, the cardiologist merely noted that he would engage in some further testing to make sure Benway was not having sustained dysrhythmias (irregular hearbeats). Id.

On November 16, 2008, Benway was examined by Lorne Querci, D.O., on behalf of the Bureau of Disability Determination. Tr. 262-267. Benway reported having breathing problems related to emphysema and chronic obstructive pulmonary disease and low back pain with left leg pain and numbness. Tr. 262. Benway stated that he was unable to walk more than a block and a half and was having difficulty walking up a flight of stairs or an incline, and walked with a cane. Tr. 263. After conducting a clinical interview and physical

---

[23](...continued)
your chest. Premature ventricular contractions are very common – they occur in most people at some point." Premature ventricular contractions, (PVCs), Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/premature-ventricular-contractions/DS00949 (Last accessed July 30, 2013). There are several causes of PVCs including the consumption of alcohol and cafeine.

examination, Dr. Querci concluded that Benway suffered from several conditions including dyspnea (shortness of breath) on exertion, a history of chronic obstructive pulmonary disease, obstructive sleep apnea, coronary artery disease,[24] myocardial infarction times 2 as reported by the patient, anxiety disorder, recent 5th metacarpal fracture, heavy tobacco addiction, and spinal muscle spasms. Tr. 266.

On November 26, 2008, Benway visited the emergency department at Memorial Hospital complaining of right hand and wrist pain. Tr. 483. The nursing notes reveal that Benway injured his "right hand 1 day ago while feeding rabbits" when a "30 pound wooden door that is used to cover the rabbit's cage [fell] on [his right hand]." Tr. 483 and 486. Benway had tingling in his hand but no lacerations of abrasions. Tr. 483. X-rays of the right hand and wrist revealed no fractures or dislocations. Tr. 484. The diagnosis was hand and wrist contusion. Tr. 484. A brace was applied and Benway was discharged in a stable condition. Tr. 485 and 487. When an attending physician reviewed Benway's systems,[25] Benway reported no cardiac, respiratory, musculoskeletal (other than the hand/wrist injury), neurological or psychiatric problems. Tr. 493. Benway did report a past medical history of back pain, chronic obstructive pulmonary disease, sleep apnea and MRSA. Id. Benway reported that he was smoking 1 pack of cigarettes per day. Id.

On December 8, 2008, Benway had a follow-up appointment with Dr. Wentland

---

[24]The medical records from the cardiologist as review above are contrary to Dr. Querci's diagnosis of coronary artery disease. The catheterization revealed that Benway's coronaries were clear.

[25]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed March 18, 2013).

regarding his right hand and wrist injury. Tr. 333. The record of this appointment is barely legible. However, we are able to discern that Benway complained of back pain and anxiety/panic attacks which were "only controlled by Ativan." Id. Dr. Wetland noted that Benway's heart had a regular, rate and rhythm and his lungs were clear to auscultation. Id. Benway's right hand grasp was weaker versus the left hand. Id. Benway had numbness of the left lateral quadriceps muscle and a positive left straight leg raise with left L4/L5 low back pain. Id.

On December 11, 2008, Benway underwent a physical therapy evaluation. Tr. 305-306. This record of this evaluation reveals that from a postural standpoint Benway had a sway back; neurologically he was intact to light touch and sharp/dull sensation; his patellar tendon reflexes were low normal/diminished; and his achilles tendon reflexes were normal. Tr. 305. Functionally it was noted that Benway was independent with ambulation and no antalgic gait was noticed and he was independent with bed mobility/transfers but slow due to complaints of pain. Tr. 306. Trunk flexion (bending forward) was limited to 35 degrees. Id.

On December 16, 2008, Benway commenced receiving mental health treatment at Wellspan Behavioral Health. Tr. 903. At the initial evaluation Benway reported several tragedies in his life, including the death of his son in 2003. Id. A mental status examination revealed that Benway's mood was depressed and anxious; his dress and hygiene were appropriate; his speech was slow; he had no delusions or hallucinations; he was oriented to person, place, time and situation; his immediate, recent and remote memory were intact; his concentration was impaired; his insight and judgment were fair; he had suicidal thoughts but no stated plan or means and no previous attempts; and his energy was

decreased and he was having too little sleep.  Id.   The assessment by a Bachelor of Science level clinician was that Benway suffered from depression, not otherwise specified and Benway was given a GAF score of 40.  Tr.  904.

On January 1, 2009, a Wellspan progress note authored by Warren Titcomb, M.C., L.P.C., C.A.C., indicates that Benway remained symptomatic with impaired functioning. Tr. 901.  The functional assessment on that date, however, is notable.   Benway had moderate impairment/incapacitation with respect to depression/sadness, anxiety, thinking, memory, concentration and activities of daily living; he had no mania, hypomania, psychosis, hallucination or delusions; he had a mild impairment/incapacitation with respect to impulsiveness, aggressiveness, recklessness, self-injurious conduct, sleep disturbance and appetite disturbance; and he had no impairment/incapacitation with respect to job performance. Id.  Wellspan progress notes authored by Mr. Titcomb  on January 20 and 26, 2009, again indicated that he had no impairment with respect to job performance. Tr. 898 and 900.  On January 29, 2009, Benway underwent a psychiatric evaluation at Wellspan. Tr. 896. The evaluator[26] concluded that Benway suffered from panic disorder without agoraphobia and generalized anxiety disorder and gave Benway a GAF score of 45. Id. It was recommended that Benway continue psychotherapy with Mr. Titcomb and that he be prescribed the drugs Effexor and Ativan. Id.

On February 10, 2009, Benway was examined by John Eshelman, M.D., on behalf of the Bureau of Disability Determination. Tr. 268-275.   At this evaluation Benway denied suffering chest pain other than as related to his shortness of breath with activity. Tr.

---

[26]The evaluation report was handwritten and mainly illegible.  The evaluator is represented to be a physician but the signature is illegible.

270. Benway indicated that his primary impairment was back and left leg pain caused by activity. Id. When reviewing Benway's systems, Benway denied any other physical problems. Id. The results of a physical examination were essentially normal, including Benway had a normal gait and station; he had good strength and normal reflexes in his upper and lower extremities; he had no wasting or atrophy of the muscles; and he was able to bend forward 90 degrees but complained of back discomfort. Tr. 271. The only somewhat abnormal finding was with respect to his lungs. Benway had a significant reduction in vital capacity but there was really no airways obstruction pattern. Id. It was suggested that the problem could be Benway's effort. Id. Dr. Eshelman's impression was that Benway suffered from cigarette addiction, panic disorder, a history of myocardial infarction not proven by data available and bronchitis with cough but very little in the way of airways obstruction. Id. With respect to work-related functional abilities, Dr. Eshelman concluded that Benway had no limitations with respect to lifting, carrying, standing, walking, sitting, and pushing and pulling. Tr. 273. Dr. Eshelman indicated that Benway could occasionally engage in postural activities such as bending, kneeling , stooping and crouching and had no limitations with respect to reaching, handling, fingering and feeling. Tr. 274. Dr. Eshelman indicated that Benway should avoid dust, fumes, odors and gases. Id.

On February 15, 2009, Benway was transported to the emergency department at Memorial Hospital by ambulance. Tr. 465. His chief complaint upon arriving at Memorial Hospital was chest pain and anxiety. Tr. 418-420. The EMS report indicates in relevant part as follows:

> Ambulance 89-1 responded . . . Crew [found] . . . white male . . .
> lying on the floor beside his bed in a left lateral recumbent position,
> [he] would moan with verbal stimuli. According to [Benway's] wife,

> [Benway's] daughter came and woke her up and told her that
> [Benway] . . . was having trouble breathing and vomiting.
> [Benway's] wife state[d] that when she found [him] he had vomited
> and was lying on the floor [complaining] of trouble breathing.
> [Benway's] wife thought that he might be having a[n] anxiety
> attack which he does have a history of.  According to the wife,
> [Benway] had drank a couple of beers at home and then walked
> across the street to the bar and drank a lot of tequila prior to coming
> home. Benway was apparently very intoxicated, and had gone to
> bed after coming home.

Tr. 465.  Another EMS document indicates that Benway "drank 7-8 beers" and 'then went to a bar and drank tequila." Tr. 467. At the hospital when Benway's systems were reviewed, he made no complaints other than chest pain, shortness of breath and vomiting. Tr. 423. Benway told the attending physician that around midnight he had 20-30 minutes of chest pain and shortness of breath. Tr. 418.  The chest pain was described as in the left side without radiation and that when he vomited the pain resolved. Id.  He also told the attending physician that "he had no coronary artery disease" and that he smokes and has a history of chronic obstructive pulmonary disease. Id.   The results of a physical examination were essentially normal. Tr. 418-419.  An electrocardiogram revealed a normal sinus rhythm with occasional premature ventricular contractions. Tr. 419.   A chest x-ray reveal mild cardiomegaly(enlarged heart), otherwise clear lungs. Id.  A blood alcohol level was 128 mg/dl over the legal limit of 80 mg/dl.  Tr. 418 and 472.  When Benway was evaluated by the attending physician he was pain free and it was decided to discharge him to home.  Tr. 419. Benway was instructed to follow-up with Dr. Wentland in 2-3 days. Id.

A Wellspan progress note authored by Mr. Titcomb  on March 4, 2009, again indicated that Benway had no impairment with respect to job performance. Tr. 895.

On March 9, 2009, Jonathan Rightmyer, Ph.D., a psychologist, reviewed the

25

medical evidence of record on behalf of the Bureau of Disability Determination and concluded that Benway suffered from an adjustment disorder with depressed mood, major depressive disorder, generalized anxiety disorder and panic disorder but that those conditions did not meet or equal the criteria of any listed impairment. Tr. 291, 294, 296 and 301. Dr. Rightmyer further found that Benway had no work-related mental limitations other than he was moderately limited in his ability to interact appropriately with the general public. Tr. 288. Dr. Rightmyer concluded that Benway was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." Tr. 289.

On April 4, 2009, Benway visited the emergency department at Memorial Hospital complaining of mild respiratory difficulty. Tr. 394. The results of a physical examination were essentially normal. Tr. 395. A chest x-ray was normal. Id. A D-dimer blood test was negative.[27] Id. A metabolic profile was negative. Id. The assessment was that Benway was suffering from chest pain, not otherwise specified. Id. He was discharged from the hospital on the same day with instructions to follow-up with his family physician. Tr. 398.

On April 7, 2009, Benway obtained a refill of Combivent and Advair[28] after

_____

[27]"D-dimer tests are ordered, along with other laboratory tests and imaging scans to help rule out the presence of a thrombus [blood clot]." Lab Tests Online, D-Dimer, http://labtestsonline.org/understanding/analytes/d-dimer/tab/test (Last accessed July 30, 2013).

[28]Combivent is used to prevent bronchospasm in people with chronic obstructive pulmonary disease. Combivent, Drugs.com, http://www.drugs.com/combivent.html (Last accessed July 30, 2013). Advair is used to prevent asthma attacks. Advair, Drugs.com, http://www.drugs.com/advair.html (Last accessed July 30, 2013).

being seen at the outpatient clinic at Memorial Hospital. Tr. 339.  During this visit Benway complained of chest wall pain times 5 days. Id.  The objective physical examination findings were all normal, including Benway had 5/5 (normal) muscle strength in the lower extremities. Id.  It was noted in the medical record that Benway was still smoking. Id.

On April 10, 2009, Benway visited the emergency department at Memorial Hospital complaining of left ankle and leg pain which had lasted 24 hours and started while walking. Tr. 376. A physical examination only revealed minimal swelling of the left leg compared to the right. Tr. 377.   An x-ray of the left ankle revealed no fracture or dislocation. Id.  A venous ultrasound of the bilateral lower extremities revealed no evidence of a venous thrombosis. Tr. 387.  Benway was discharged from the hospital the same day. Tr. 379.

On April 21, 2009, Benway underwent a physical therapy evaluation. Tr. 312-313.   The record of this evaluation reveals that from a postural standpoint Benway had a "mild flattened lumbar lordosis" and an "obese abdomen." Tr. 312.  Neurologically he was intact to light touch and sharp/dull sensation; his patellar tendon reflexes were normal; and his achilles tendon reflexes were increased but normal.  Id.  Functionally it was noted that Benway's gait involved a decreased stance with respect to the left lower extremity and with respect to bed mobility/transfers he was slow, stiff and tentative due to pain.  Tr. 313. Trunk flexion (bending forward) was limited to 42 degrees.  Id.

On April 23, 2009, Benway visited the outpatient clinic at Memorial Hospital complaining of pain in left lung. Tr. 338.  When the attending physician reviewed Benway's systems, Benway denied any skin, neurological, psychiatric, hematological/lymphatic, and ear, eyes, nose, throat and mouth problems. Id.   The only systems mentioned by Benway were the cardiovascular, respiratory and musculoskeletal but the only specific problems

associated with those systems were left sided chest pain and left leg weakness. Id. However, the physical examination revealed that Benway had 4/5 muscle strength in the left lower extremity[29] and 5/5 in the right lower extremity.  Id.  He also had trace pedal edema of left ankle and he was obese. Id.   The report of this visit notes that Benway was smoking 1 pack of cigarettes per day. Id.  The assessment was that Benway suffered from intercostal neuralgia.[30] Id.

A physical therapy record dated May 1, 2009, reveals that Benway failed to appear for 3 appointments. Tr. 318.  A progress note from Wellspan Behavioral Health dated May 11, 2009, indicates that Benway was to continue with psychotherapy.[31] Tr. 894.  On June 9 and 10, 2009, Benway was treated at the emergency department of Memorial Hospital for an abscess on the back and discharged to home in a stable condition. Tr. 364-368.

On June 24, 2009,  Benway underwent a physical therapy evaluation at Memorial Hospital. Tr. 319-320.   The record of this evaluation reveals that neurologically Benway was intact to light touch and sharp/dull sensation; his patellar tendon reflexes were normal on the right and low normal on the left; and his achilles tendon reflexes were  normal. Id.  Functionally it was noted that Benway was independent with respect to his gait and  bed mobility/transfers. Tr. 320.  Benway had a negative straight leg raising test. Id. Trunk flexion (bending forward) was limited to 40 degrees.  Id.   It was stated that Benway's pain was

---

[29]4/5 signifies movement against external resistance but less than normal.

[30]Intercostal neuralgia is condition involving the  nerves between the ribs and bands of pain along the course of the nerves.  Generally the condition is sporadic or intermittent.

[31]The note is mostly illegible.

primarily muscular. Id.

The record contains progress notes from Wellspan Behavioral Health dated July 16, August 27, and November 30, 2009, and January 7, 2010, which are mostly illegible and do not shed light on Benway's work-related mental functional abilities. Tr. 893 and 920-922. An outpatient clinic progress note from Memorial Hospital dated September 17, 2009, reveals that Benway was smoking 2 packs of cigarettes per day and had a spot on his back that needed to be checked. Tr. 918. The assessment was that Benway suffered from chronic obstructive pulmonary disease and tobacco abuse. Id.

Finally, a medical source statement of Benway's work-related mental abilities was completed by a medical professional on April 29, 2010. Tr. 929-930. The signature of the individual signing the statement is illegible.[32] Tr. 930. The statement indicates that Benway's mental impairments result in limitations that are disabling, but also that Benway was not compliant with treatment and had not been seen since January 7, 2010. Tr. 929-930. Furthermore, the statement does not indicate that Benway's disabling limitations lasted for 12 or more continuous months. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Benway had not engaged in substantial gainful activity since August 14, 2007, the alleged disability onset date. Tr. 13. The administrative law judge specifically stated that "[w]hile the claimant has earnings after the alleged onset date [], they are not consistent with work at the substantial gainful activity level." Id.

---

[32]We assume that the statement was completed by a psychiatrist or psychologist employed at Wellspan Behavioral Health.

At step two, the administrative law judge found that Benway suffers from the following severe impairments: "chronic obstructive pulmonary disease, sleep apnea, coronary artery disease, disorder of the lumbar spine, anxiety, and depression." Id. The administrative law judge noted that Benway alleged that his MRSA was a disabling condition but found that it was a nonsevere impairment because the condition "responded to appropriate treatment within a twelve month period."[33] Id.

At step three of the sequential evaluation process the administrative law judge found that Benway's impairments did not individually or in combination meet or equal a listed impairment. Id. The ALJ reviewed Listings 3.00 relating to the respiratory system, 4.00 relating to the cardiovascular system, 1.00 relating to the musculoskeletal system, and mental health Listings 12.04 and 12.06. Tr. 14. The ALJ in finding that Benway's conditions did not meet or equal a listing relied on the opinions of the state agency physician and psychologists. Tr. 14-15 and 17-18.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Benway could not perform his past relevant medium work but that he could perform a limited range of unskilled, sedentary work. Tr. 15 and 19. Specifically, the administrative law judge found that Benway could perform sedentary work

> except that he requires a job where he can sit/stand
> essentially at will; he is limited to routine repetitive
> (unskilled) work; he is limited to work that does not require
> precise attention to detail; he is limited to work requiring
> no significant interaction with others (i.e., no team work
> an no sales work); and he has a global assessment of
> functioning of 57.

---

[33]In the present appeal, Benway does not allege that it is a disabling impairment.

Tr. 15. In arriving at this residual functional capacity the administrative law judge found that Benway's statements about his pain and physical and mental functional limitations were not credible. Tr. 17. In additional the administrative law judge placed substantial weight on the opinions of Dr. Hart and Dr. Eshelman. Tr. 17 The administrative law judge rejected the GAF score assessed by a Bachelor of Science level clinician and the GAF score of 45 assessed by an unidentified medical provider at Wellspan. The ALJ stated that those scores were disproportionate to the treatment history and clinical findings. In so finding he relied on the GAF score of 57 assessed by Dr. Hart.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Benway had the ability to perform work such as a semi-conductor bonder, carding machine operator and a stuffer machine tender,[34] and that there were a significant number of such jobs in the local and national economies. Tr. 20 and 50.

The administrative record in this case is 976 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Benway's medical history and vocational background in his decision. Tr. 11-20. Furthermore, the brief submitted by the Commissioner also adequately reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.

Benway argues that the administrative law judge (1) erred at step 3 of the sequential evaluation process in failing to find that Benway met or equaled Listings 1.04, 12.04 and 12.06, and (2) erred when he found that Benway had the residual functional

---

[34] All of these position are classified by the Dictionary of Occupational Titles as unskilled, sedentary work. Tr. 50.

capacity to be introduced back into the work force at the sedentary-duty level. We find no merit in Benway's arguments.

Before we address the criteria/requirements of the listings raised by Benway we will mention some basic principles set forth in case law and the regulations of the Social Security Administration. If Benway's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d). To do this a claimant must show that all of the criteria for a listing are met or equaled. Id. An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id.

The determination of whether a claimant meets or equals a listing is a medical one. Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing. However, an administrative law judge is not required to accept a physician's opinion when that opinion is not supported by the objective medical evidence (raw data) in the record. Maddox v. Heckler, 619 F. Supp. 930, 935-936 (D.C.Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 250 (2011).

To satisfy Listing 1.04A, Benway had the burden of proving that he had a disorder of the spine, (e.g.,herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain; limitation of motion of the spine; motor

loss (atrophy with associated muscle weakness or muscle weakness); accompanied by sensory or reflex loss; and, if there is involvement of the lower back, with positive straight-leg raising tests in the sitting and supine position.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (2011).

Benway has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met or equaled the requirements of a listed impairment.  The record is devoid of positive straight-leg raising tests in the sitting and supine position.  Furthermore, Benway does not identify, and the record does not appear to contain, an express finding of nerve root compression.  There is no consistent evidence that Benway had nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss and positive straight-leg raising during the relevant period at issue.

In order to meet either Listing 12.04 or 12.06, Benway had to have either two "marked" limitations in the categories of activities of daily living; maintaining social functioning; and concentration, persistence or pace; or one "marked" limitation coupled with repeated episodes of decompensation, each of an extended duration. See 20 C.F.R., Pt. 4040, Subpt. P, App. 1, §§  12.04 and 12.06. No treating or examining psychologists or psychiatrist concluded that Benway's impairments met or equaled Listings 12.04 and 12.06 and was unable to engage in unskilled, sedentary employment.  In contrast Dr. Rightmyer, a state agency psychologist, concluded that Benway's mental conditions did not meet or equal the criteria of Listings 12.04 and 12.06 and was able to meet the basic mental demands of competitive work on a sustained basis.

No treating physician, psychiatrist or psychologist has indicated that Benway

suffered from physical or mental functional limitations that would preclude him from engaging in the limited range of work set by the administrative law judge in his decision for the requisite statutory 12 month period.[35]  The functional assessment provided by an unidentified medical provider at Wellspan Behavioral Health 3 months after Benway's last actual appointment does not indicate that his limitations lasted or were expected to last for a continuous 12 month period.  Also, there is no assessment regarding Benway's work-related physical limitations from a treating physician.  In contrast a state agency physician, Dr. Eshelman, and two state agency psychologist, Dr. Hart and Dr. Rightmyer, have provided assessments which support the decision of the administrative law judge.   Under those circumstances, it was clearly appropriate for the administrative law judge to rely on the physical functional assessment of Dr. Eshelman and the mental functional assessment of Dr. Hart and Dr. Rightmyer. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

    Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42

---

[35]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

U.S.C. § 405(g) affirm the  decision of the Commissioner.

An appropriate order will be entered.

s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: August 2, 2013